[No. D044674. Fourth Dist., Div. One. Apr. 28, 2005.]

In re CARL R., JR., a Person Coming Under the Juvenile Court Law.
SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,
Plaintiff and Respondent, v.
RENNE B. et al., Defendants and Appellants.

## COUNSEL

Donna B. Kaiser, under appointment by the Court of Appeal, for Defendant and Appellant Renne B.

Neil R. Trop, under appointment by the Court of Appeal, for Defendant and Appellant Carl R., Sr.

John J. Sansone, County Counsel, Susan Strom, Chief Deputy County Counsel, and Paula J. Roach, Deputy County Counsel, for Plaintiff and Respondent.

Julie E. Braden, under appointment by the Court of Appeal, for Minor.

## OPINION

**AARON, J.**—Renne B.[1] appeals the judgment terminating her parental rights to her son, Carl R., Jr. (Carl), under Welfare and Institutions Code section 366.26.[2] Carl also appeals the judgment and Renne and Carl have each joined in the other's appeal.[3] Appellants argue parental rights should not have been terminated because the court did not consider whether the prospective adoptive parents would meet Carl's educational needs; the prospective adoptive parents' plan to home school Carl constituted a legal impediment to adoption; the court refused to hear evidence pertaining to Carl's specific educational needs, denying him due process; the court should have admitted evidence on the issue of whether the section 366.26, subdivision (c)(1)(D) exception to terminating parental rights applied; and terminating parental rights was not in Carl's best interests. They also argue the court should not have summarily denied Carl's section 388 modification petition brought after parental rights were terminated. We affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Carl has cerebral palsy, severe quadriparesis, a seizure disorder, and an uncontrolled and severe psychomotor delay. Because of his disabilities, he will always require total care. He has lived at the Children's Convalescent Hospital in San Diego since 1996, when he was four months old. At the time of the July 2004 section 366.26 hearing, he was almost eight years old, but had the emotional maturity of an eight-month-old child.

In March 2000, when Carl was three and one-half years old, the San Diego County Health and Human Services Agency (the Agency) filed a section 300 petition on his behalf. The petition alleged his parents had refused to provide him with necessary treatment and had left him without adequate support. The court made a true finding on the petition, declared Carl to be a dependent, and removed him from parental custody. However, because Father was incarcerated and Renne failed to reunify with five other children, the court provided no reunification services and scheduled a section 366.26 hearing.

A social worker assessed Carl to be adoptable because a volunteer at the hospital, Lynn C., wanted to adopt him. Based on that assessment, in November 2000, the court found Carl was adoptable and terminated parental rights. The parents separately appealed. In an unpublished opinion,

---

[1] Renne is identified as Renee by her counsel. However, because she is identified as Renne throughout the record, we shall use that spelling of her name.

[2] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

[3] Carl's father, Carl R. (Father), has also joined the appeals, but did not file a timely notice of appeal.

*In re Carl R.*, filed April 25, 2001, D036789, this court reversed the judgment terminating parental rights on the ground that the Agency's preliminary assessment of Lynn did not comply with section 366.21, subdivision (i)(4) because it contained no information about whether she had a criminal background or any referrals for child abuse or neglect, and did not address her parenting skills, her capacity to meet Carl's needs, or her understanding of the legal or financial responsibilities of adoption. We directed the court to hold a new section 366.26 hearing after the Agency submitted a proper assessment report to the court.

Lynn's adoption application was subsequently denied because she had a criminal record and a history with child protective services. After another prospective adoptive placement failed, the court instituted a permanent plan of long-term foster care in January 2002.

By July 2003, the Agency had located the M. family as a prospective adoptive family for Carl. The family lived outside of Sacramento and had cared for profoundly disabled children since 1971.

In October 2003, the G. family expressed an interest in adopting Carl and sent an application to the Agency. Their son was also significantly developmentally disabled and attended the same school as Carl. In November, the court scheduled a section 366.26 hearing.

In December 2003, Carl filed a section 388 modification petition seeking an order preventing his removal to a placement outside of San Diego County. He asserted he had a strong relationship with Lynn, the G. family wished to adopt him, and that he would be able to continue with the services and education he was receiving if he remained in San Diego. After a lengthy hearing during which the court heard testimony on the issue of whether Carl's best interests would be better served by placement with the M. family or the G. family, the court denied the petition. Carl appealed. In March 2004, the Agency informed the juvenile court that this court had "upheld the lower Court's orders indicating that the Agency had authorization to move Carl to the Adoptive Home."[4] The court scheduled a new section 366.26 hearing and ordered that Carl remain in the convalescent hospital until the issues raised at that hearing were resolved.

---

[4] This court dismissed the appeal from Carl's December 2003 section 388 modification petition as moot. (*In re Carl R.* (Jun. 25, 2004, D0435890) [nonpub. opn.].) Although not in our record here, our internal records indicate Carl brought a writ of supersedeas in conjunction with his appeal from the denial of that petition. We dismissed that writ petition in March 2004, and assume the Agency was referring to this dismissal in its report.

In May 2004, Carl filed another section 388 modification petition seeking an order keeping him in San Diego County. In his petition, he asserted that the G. family had completed their adoption evaluation and that it was in his best interests to remain in San Diego. That petition was apparently scheduled to be heard at the same time as the section 366.26 hearing. At the section 366.26 hearing, however, the court indicated that it would address the issues raised in the section 388 modification petition after it determined whether parental rights should be terminated.

The section 366.26 hearing occurred in June and July 2004. After hearing two days of testimony, the court issued a written ruling prohibiting Carl and Renne from producing evidence showing that the education Carl would receive in San Diego furthered his best interests to a greater extent than being home schooled by the M. family would. On July 9, 2004, the court terminated parental rights after finding that Carl was adoptable because the M. family wanted to adopt him and had been approved for adoption and that none of the section 366.26, subdivision (c)(1) exceptions applied.

Immediately after the court terminated parental rights, Carl filed a section 388 modification petition seeking to modify the order the court had just issued.[5] He sought to remain in the hospital in San Diego until the G. family had received their foster care license or had been approved as an adoptive home. The court denied the petition, finding that Carl had not established changed circumstances. Carl and Renne separately appeal.

## DISCUSSION

### I

### ADOPTABILITY

A. *The Juvenile Court Sufficiently Assessed the Prospective Adoptive Parents' Ability to Meet Carl's Needs*

Appellants assert the judgment should be reversed because the court did not consider whether the M. family would meet Carl's educational needs.

The juvenile court may terminate parental rights only if it determines by clear and convincing evidence that it is likely the child will be adopted within a reasonable time. (§ 366.26, subd. (c)(1); *In re Jennilee T.* (1992) 3 Cal.App.4th 212, 223 [4 Cal.Rptr.2d 101].) " ' " 'Clear and convincing' evidence requires a finding of high probability. The evidence must be so clear

---

[5] On June 1, 2004, the court declared Carl's May 2004 section 388 petition moot. Carl's counsel requested permission to file a new section 388 petition "depending on the .26 ruling." The court indicated that counsel would be allowed to file a new section 388 petition once the section 366.26 hearing had concluded.

as to leave no substantial doubt. It must be sufficiently strong to command the unhesitating assent of every reasonable mind. [Citations]" ' [Citations.]" (*In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1205 [101 Cal.Rptr.2d 449].) Review of a determination of adoptability is limited to whether those findings are supported by substantial evidence. (*In re Lukas B.* (2000) 79 Cal.App.4th 1145, 1154 [94 Cal.Rptr.2d 693].)

The question of adoptability posed at a section 366.26 hearing usually focuses on whether the child's age, physical condition, and emotional state make it difficult to find a person willing to adopt that child. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 [28 Cal.Rptr.2d 82].) If the child is considered generally adoptable, we do not examine the suitability of the prospective adoptive home. (*In re Scott M.* (1993) 13 Cal.App.4th 839, 844 [16 Cal.Rptr.2d 766].) However, where the child is deemed adoptable based solely on the fact that a particular family is willing to adopt him or her, the trial court must determine whether there is a legal impediment to adoption. (See, e.g., *In re Sarah M., supra*, 22 Cal.App.4th at p. 1650.)

Here, all parties agree Carl is adoptable only because the M. family is willing to adopt him. Appellants assert that under these circumstances, the juvenile court must consider whether the M. family is suitable and, specifically, whether the M. family can meet Carl's special educational needs.

The Agency disagrees. Citing to *In re Scott M., supra*, 13 Cal.App.4th 839, *In re Sarah M., supra*, 22 Cal.App.4th 1642, and *In re T.S.* (2003) 113 Cal.App.4th 1323 [7 Cal.Rptr.3d 173], the Agency asserts that the inquiry is limited to whether there are any legal impediments to adoption under Family Code sections 8601, 8602, and 8603. Family Code sections 8601, 8602, and 8603 respectively provide that a prospective adoptive parent must be at least 10 years older than a child unless certain exceptions apply, a child older than 12 must consent to adoption, and a prospective adoptive parent not lawfully separated from a spouse must obtain consent from the spouse. The Agency further argues the question of the family's suitability to adopt is an issue reserved for subsequent adoption proceedings.

We agree with the analysis in the cases cited by the Agency that, as a general rule, the suitability of the prospective adoptive family does not constitute a legal impediment to adoption and is irrelevant to the issue of whether a child is likely to be adopted. (*In re Scott M., supra*, 13 Cal.App.4th at p. 844; *In re Sarah M., supra*, 22 Cal.App.4th at p. 1650; *In re T.S., supra*, 113 Cal.App.4th at p. 1329.) If an inquiry into the suitability of prospective adoptive parents were permitted at the section 366.26 hearing, many hearings

would degenerate into subjective attacks on those prospective adoptive parents—a result not envisioned by the statutory scheme. (*In re Scott M.*, *supra*, 13 Cal.App.4th at p. 844.) Those types of inquiries might also discourage people from seeking to adopt, a result that would contravene the strong public policy favoring adoption.

However, the issue before this court is very narrow—what is the proper scope of the inquiry by the juvenile court in determining the adoptability of a child who will require intensive care for life? The children in the cases cited by the Agency were *generally* adoptable, rendering the availability of prospective adoptive parents irrelevant to the adoptability findings. (*In re Scott M.*, *supra*, 13 Cal.App.4th at p. 843; *In re Sarah M.*, *supra*, 22 Cal.App.4th at p. 1651; *In re T.S.*, *supra*, 113 Cal.App.4th at p. 1329.) Those courts did not address the proper scope of the inquiry the juvenile court must make when the child in question is adoptable only because one family is willing to adopt, nor did those courts determine the nature of the inquiry required where the child in question is completely developmentally disabled. Thus, *In re Scott M.*, *In re Sarah M.* and *In re T.S.* are not on point and do not assist our determination of what the scope of the court's inquiry should be to properly assess the adoptability of a child like Carl, who will require total care for life.

■ A child who is specifically adoptable and who will need total care for life is at high risk of becoming a legal orphan if parental rights are terminated and the prospective adoptive family is later determined to be unsuitable.[6] This could occur if the courts analyze only whether there is a legal impediment to adoption, as indicated by *In re Scott M.*, *In re Sarah M.*, and *In re T.S.* To avoid rendering a total needs child a legal orphan, the assessment of the adoptability of such a child must necessarily include some consideration of whether the prospective adoptive parents can meet that child's needs, since if the prospective adoptive parents cannot meet the child's needs, the child cannot properly be found to be adoptable. The question becomes the extent of the inquiry to be conducted by the juvenile court at the section 366.26 hearing in such a case.

■ The statutory scheme requires the Agency to provide the court with a preliminary assessment of the eligibility and commitment of the prospective adoptive parents for the section 366.26 hearing. That assessment includes a

---

[6] Legal orphanage is a consequence the law abhors. (*In re Jayson T.* (2002) 97 Cal.App.4th 75, 85 [118 Cal.Rptr.2d 228], disapproved on other grounds in *In re Zeth S.* (2003) 31 Cal.4th 396, 413–414 [2 Cal.Rptr.3d 683, 73 P.3d 541].)

social history, screening for criminal records and prior referrals for child abuse or neglect, together with an assessment of the capability of the prospective adoptive parents to meet the child's needs, and whether they understand the legal and financial rights and responsibilities of adoption. (§§ 361.5, subd. (g)(4), 366.21, subd. (i)(4), 366.22, subd. (b)(4).)

■ Appellants argue that the phrase "the capability to meet the child's needs" includes an assessment of the prospective adoptive parents' specific educational plan. We disagree. Although in order to meet a child's needs, the parents must educate the child (Ed. Code, § 48200), there is no authority requiring the court to assess the specifics of how the child will be educated. Because the Agency's obligation is to provide only preliminary information, the court's inquiry should also be preliminary, and need not include an in-depth assessment of specific educational plans.

■ In our view, an inquiry into the prospective adoptive parents' specific educational plan is not appropriate. Parents have many options for how they provide an education for their child. They may send a child to "public full-time day school or continuation school or classes . . . ." (Ed. Code, § 48200.) Admittedly, certain educational plans are better than others. The educational opportunities provided by public schools differ from student to student depending on multiple factors that may affect a particular student's ability to learn. (*Board of Education v. Rowley* (1982) 458 U.S. 176, 198 [73 L.Ed.2d 690, 102 S.Ct. 3034].) Public school districts vary widely in quality. Some parents consider private education to be generally better than public education. Home schooling has advantages and disadvantages. An inquiry into the prospective adoptive parents' plan to educate could very easily degenerate into assessing which school districts are better or who could afford to send a child to the better private school. This is neither a necessary nor appropriate inquiry at a time when the court is conducting only a preliminary assessment of whether the child's educational needs will generally be met.

■ Further, there is no requirement that the state provide specialized educational services to disabled children to maximize each child's potential commensurate with the opportunity provided to nondisabled children. (*Board of Education v. Rowley, supra,* 458 U.S. at p. 199.) If no such requirement is placed on the state, no such requirement may be placed on parents. Simply stated, what the prospective adoptive parents must show is that they intend to educate Carl. The court need make no further inquiry at the section 366.26 hearing.

Having concluded the court need not look at the specific educational plan, we turn to whether there was sufficient evidence in the record to support the finding that the M. family would educate Carl. The evidence amply supports that finding.

The M. family has been providing a home for disabled children since 1971. Their 3,600 square foot home has one wing specially designed to accommodate profoundly disabled children.

The M. family has raised 40 to 45 special needs children. Doing so is "second nature" to them. They have two total needs adopted children. The children play inside and outside and have access to a pool and a therapy whirlpool. The M. family takes the children on outings three times a week to visit family members who have children and also takes them on special or recreational outings a few times a month. The children visit local ponds and feed the birds.

The M. family chose to home school their children in order to reduce their risk of exposure to bacteria and viruses, which the social worker thought was sensible. The social worker believed Carl would thrive in the home of the M. family.

Carl's pediatrician believed Carl should receive an education comparable to the education he was receiving in San Diego.[7] The evidence showed the M. family would provide such an education. The charter school and the special education teacher who worked with the M. family were going to duplicate, to the extent possible, the education Carl was receiving in San Diego. The professionals involved were skilled and had treated children who had needs similar to Carl's. They believed they could meet Carl's needs and indicated they would order specific equipment for him if necessary. The charter school has funding available for each child that enabled the school to purchase a significant amount of equipment and toys for each child. Further, a teacher would come to the home on a monthly basis to set up appropriate lesson plans.

Appellants contend reversal is required because the court refused to consider Carl's educational needs at all. Appellants base this argument on the court's statement that "[w]hat I am specifically not finding is whether Carl's needs are going to be met in the [M.s'] home. I can't make that finding

---

[7] We note that when Carl's physician was asked whether the education Carl was receiving in San Diego was assisting him, the physician replied, "I have not seen an observable difference in Carl."

because, based on my written ruling yesterday, which was based on the limited legal authority that I am aware of, I limited that inquiry at the .26 hearing. And, therefore, I precluded counsel from adducing—what I think counsel really wanted to do is for the minor and the mother, is to challenge that decision that the home would be appropriate. And my ruling prevented them from doing that."

This statement must be considered in context. The court referred to its written ruling from the previous day. That ruling limited appellants' ability to introduce evidence showing that the M. family's educational plan would not be in Carl's best interests. In other words, the court was not going to allow evidence as to which educational plan was superior. The court did not limit the ability of any party to show that the M. family did or did not intend to educate Carl. Further, the court had previously found that the Agency made a threshold showing that Carl's educational needs would be met. The court sufficiently considered whether the M. family would educate Carl, which is all that is required at the section 366.26 hearing. Substantial evidence supports the finding that the M. family would meet Carl's educational needs.

B. *The Plan to Home School Carl Does Not Constitute a Legal Impediment to Adoption*

Appellants assert the judgment should be reversed because the plan to home school Carl constitutes a legal impediment to his adoption by the M. family. They argue the Individuals with Disabilities Education Act (20 U.S.C. § 1400 et seq.) (the IDEA) requires that Carl attend public school.

Congress enacted the IDEA to address the special educational needs of children with disabilities. (20 U.S.C. § 1400.) The impetus for the IDEA arose from the efforts of parents of disabled children to prevent the exclusion or expulsion of disabled children from public schools. (*School Committee of the Town of Burlington, Massachusetts v. Department of Education* (1985) 471 U.S. 359, 373 [85 L.Ed.2d 385, 105 S.Ct. 1996] (*Burlington*).) The IDEA ensures "that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living[.]"[8] (20 U.S.C. § 1400(d)(1)(A).)

---

[8] Similarly, the California Legislature has declared that "all individuals with exceptional needs have a right to participate in free appropriate public education . . . ." (Ed. Code, § 56000.)

■ The crux of appellants' argument is that the IDEA requires parents to send their disabled children to public school. They cite no authority that supports this proposition.[9] To the contrary, parents' rights to direct their child's upbringing is a compelling right " '. . . "ranked among the most basic of civil rights." ' [Citation.]" (*American Academy of Pediatrics v. Lungren* (1997) 16 Cal.4th 307, 396 [66 Cal.Rptr.2d 210, 940 P.2d 797].) A statute that would require a parent to place a child in public school would be an unconstitutional deprivation of the parents' liberty rights to determine how their child should be educated. (*Pierce v. Society of Sisters* (1925) 268 U.S. 510, 534–535 [69 L.Ed. 1070, 45 S.Ct. 571]; *People v. Turner* (1953) 121 Cal.App.2dSupp. 861, 865 [263 P.2d 685].)

■ In any event, the IDEA does not require that parents place their children in public school. The IDEA "requires participating *state and local educational agencies* 'to assure that [disabled] children and their parents or guardians are guaranteed procedural safeguards with respect to the provision of free appropriate public education' to such [disabled] children." (*Burlington, supra,* 471 U.S. at p. 361, italics added; see also 20 U.S.C. § 1415(a).) The purpose of the IDEA is to prevent school officials from removing a disabled child from a public classroom. (*Burlington, supra,* 471 U.S. at p. 373.) It is a requirement imposed on state and local educational agencies, not parents. Indeed, the educational choice made by the parents for a disabled child need not meet the standards required by the IDEA. (*Florence County School District Four v. Carter* (1993) 510 U.S. 7, 14 [126 L.Ed.2d 284, 114 S.Ct. 361].) Simply stated, the IDEA prevents state and local agencies from excluding disabled children from public school; it does not govern the actions of parents who choose to home school their children.

Appellants argue the M. family could not home school Carl because his court-appointed special advocate (CASA) had the sole right to make educational decisions on his behalf. Their argument implies the court's order that the CASA makes educational decisions for Carl continues in perpetuity, unless changed by the court. They are incorrect.

■ A court may limit the parents' ability to make educational decisions on their child's behalf. (§ 361, subd. (a).) If the court does so, it appoints a responsible adult to make the educational decisions. (§ 361, subd. (a).) However, under that section, the court may limit the right of a parent to make

---

[9] The cases cited by appellants, *Sacramento City Unified School District v. Rachel H.* (9th Cir. 1994) 14 F.3d 1398, 1400 and *Roncker v. Walter* (6th Cir. 1983) 700 F.2d 1058, 1060, address the school districts' refusal to place a disabled child into a regular classroom full-time and the decision to place a child into a county school exclusively reserved for mentally retarded children, respectively. Neither addresses whether the IDEA prevents a parent from home schooling a developmentally disabled child.

educational decisions only when the child is a dependent. (§ 361, subd. (a).) Once Carl is adopted, he will no longer be a dependent child and the appointment of the CASA to make educational decisions will necessarily end. The CASA's preference is therefore irrelevant.

 Appellants maintain that Carl's individualized education program (IEP) requires that he attend a public school. They are incorrect. An IEP is a comprehensive statement of a disabled child's educational needs and the specifically designed instruction and related services that will meet those needs. (*Burlington, supra,* 471 U.S. at p. 368.) It is developed by a school official qualified in special education, the child's teacher, and the parents. (*Ibid.*) It guides the school system as to how the child will be educated. However, parents may disregard the IEP and educate their child in a manner different from that specified by the IEP.[10] (*Burlington, supra,* 471 U.S. at pp. 373–374; *Florence County School District Four v. Carter, supra,* 510 U.S. at p. 13; 34 C.F.R. § 300.403.) Thus, the M. family may disregard the current IEP.

Moreover, an IEP is reviewed at least annually and revised as necessary. (20 U.S.C. § 1414(d)(4).) Because Carl's last IEP was dated October 8, 2003, he would have been due for a new IEP in October 2004, three months after the section 366.26 hearing. That new IEP would take into account the M. family's wish to home school him. The decision to home school is not a legal impediment that prevents adoption.

C. *Carl's Due Process Rights Were Not Violated When the Court Refused to Hear Evidence on the Educational Programs Available in San Diego County*

Appellants assert the judgment must be reversed because Carl's due process rights were violated by the court's refusal to allow him to produce evidence about his educational needs.[11]

---

[10] Citing to California Code of Regulations, title 5, section 3051.4, subdivision (a), appellants argue that parents may home school a child only when the IEP so requires. Although that section states that "[s]pecial education and related services provided in the home . . . is limited to those pupils . . . for whom the individualized education program team recommends," this governs the actions of the school districts, not the actions of parents. Any other interpretation would be an unconstitutional deprivation of the parents' liberty rights. (*Pierce v. Society of Sisters, supra,* 268 U.S. at pp. 534–535; *People v. Turner, supra,* 121 Cal. App. 2d at p. Supp. 865.)

[11] Although appellants cast part of their argument as a substantive due process violation, the crux of the argument is that Carl was precluded from producing evidence about his educational needs. Thus, the argument is one of procedural, not substantive, due process.

■ Procedural due process pertains to notice and the opportunity to be heard. (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 412–413 [15 Cal.Rptr.2d 613].) Due process rights exist at the section 366.26 hearing. (*In re Jeanette V.* (1998) 68 Cal.App.4th 811, 816 [80 Cal.Rptr.2d 534].) However, the right to present evidence is limited to presenting "relevant evidence of significant probative value to the issue before the court." (*Id.* at p. 817.)

■ As discussed above, the issue at the section 366.26 hearing is whether the prospective adoptive parents intend to educate the child. The hearing does not involve a qualitative assessment of the best possible way to provide that education. Carl's counsel acknowledged that the testimony she sought to introduce was relevant to the issue of which educational plan would be better for Carl.[12] She stated, "I can't, in all frankness, say that we can give this court—that there would be evidence to this court that the [M.s'] home is totally void in benefit to Carl educationally. I'm not suggesting that." In other words, Carl was not seeking to introduce evidence that the M. family was not going to educate him, which would have been allowed under the court's ruling; he was seeking to introduce evidence that he believed the education he would receive in San Diego would be superior to that he would receive in the M. home. Because this is not relevant to whether the M. family would meet Carl's need to receive an education, the court properly excluded it. Carl's due process rights have not been violated.

II

## THE EXCEPTION TO TERMINATING PARENTAL RIGHTS SET FORTH IN SECTION 366.26, SUBDIVISION (c)(1)(D) DOES NOT APPLY

Appellants assert the court committed reversible error by refusing to allow them to produce evidence regarding the applicability of the section 366.26, subdivision (c)(1)(D) exception.

Section 366.26, subdivision (c)(1)(D) provides that parental rights should not be terminated when, "[t]he child is living with a relative or foster parent who is unable or unwilling to adopt the child because of exceptional circumstances, that do not include an unwillingness to accept legal or financial responsibility for the child, but who is willing and capable of

---

[12] Counsel intended to call a teacher at Carl's current school who would testify about the new program that was going to be offered in the fall of 2004 and the advantages and disadvantages of various programs for Carl, and an educational consultant who would testify about an inclusion program for special education children.

providing the child with a stable and permanent environment and the removal of the child from the physical custody of his or her relative or foster parent would be detrimental to the emotional well-being of the child."

Appellants argue the court should have considered the section 366.26, subdivision (c)(1)(D) exception in light of Carl's relationship with Lynn. They acknowledge that this exception is not precisely applicable because Lynn is neither Carl's relative nor foster parent, he was not living with her, and he would not be removed from her custody. They urge us, nonetheless, to find error in the juvenile court's refusal to consider the exception. The plain meaning of section 366.26, subdivision (c)(1)(D) does not allow us to do so.

" 'We begin by examining the words of the [statute]; if the statutory language is not ambiguous, then we presume the Legislature meant what it said, and the plain meaning of the language governs.' [Citation.]" (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1129 [13 Cal.Rptr.3d 616]; see also *Franzosi v. Santa Monica Community College Dist.* (2004) 118 Cal.App.4th 442, 448 [13 Cal.Rptr.3d 25].) There is nothing ambiguous in section 366.26, subdivision (c)(1)(D); thus, its plain language governs. It applies only when the child is living with a foster parent or relative who is unable to adopt. Because Carl was not living with Lynn and Lynn was not his foster parent or relative, the subdivision does not apply. Whether there should be an exception to terminating parental rights when a child has a close bond with a person with whom he or she does not live and who is not a relative or foster parent is a question for the Legislature, not this court. (*In re Jose H.* (2000) 77 Cal.App.4th 1090, 1099–1100 [92 Cal.Rptr.2d 228].) The court did not err in refusing to allow appellants to introduce evidence pertaining to Carl's relationship with Lynn, since such evidence was not relevant to establish the existence of the section 366.26, subdivision (c)(1)(D) exception.

## III

## THERE IS NO GENERAL "BEST INTERESTS" EXCEPTION TO TERMINATING PARENTAL RIGHTS

Appellants assert the judgment should be reversed because it was not in Carl's best interests to be freed for adoption. They acknowledge that there is no independent best interests exception to terminating parental rights and that none of the five enumerated exceptions in section 366.26, subdivision (c) fit

Carl's situation, yet they urge us to reverse the judgment, arguing it is in Carl's best interests to maintain his relationship with Lynn and take advantage of the educational opportunities offered in San Diego County.

■ Adoption has long been the preferred permanent plan if the parents are unable to reunify. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 [32 Cal.Rptr.2d 535].) Under section 366.26, once the court determines a child is adoptable, it must terminate parental rights unless it finds one of the section 366.26, subdivision (c)(1) exceptions applies. (*In re Ninfa S.* (1998) 62 Cal.App.4th 808, 811 [73 Cal.Rptr.2d 209].) The only exceptions to terminating parental rights are those prescribed by section 366.26, subdivision (c)(1). (*In re Ninfa S., supra,* 62 Cal.App.4th at p. 811.)

■ The court should consider the child's best interests when making its determination at the section 366.26 hearing. (*In re Tabatha G.* (1996) 45 Cal.App.4th 1159, 1165 [53 Cal.Rptr.2d 93].) However, the court must consider the best interests of the child only in the context of whether one of the exceptions in section 366.26, subdivision (c)(1)(A) through (E) applies. (*In re Tabatha G., supra,* 45 Cal.App.4th at p. 1165; § 366.26, subd. (c)(4)(A).) The purpose of the specified exceptions is to ensure that termination of parental rights is in the child's best interests and is the least detrimental alternative. (*In re Tabatha G., supra,* 45 Cal.App.4th at p. 1165.) If no exception applies, it is in the child's best interests to terminate parental rights. (See, e.g., *In re Ninfa S., supra,* 62 Cal.App.4th at p. 811.) Here, none of the exceptions applied. Thus, the court was not required to consider further whether Carl's best interests would be better served by a different permanent plan.[13] (*In re Tabatha G., supra,* 45 Cal.App.4th at p. 1165.)

■ The Legislature has determined what is in a child's best interests by implementing the procedures, presumptions, and time lines in the dependency scheme. (*In re Zeth S., supra,* 31 Cal.4th at p. 410.) The Legislature has

---

[13] Citing to *In re Jose V.* (1996) 50 Cal.App.4th 1792 [58 Cal.Rptr.2d 684], and *In re Jessie G.* (1997) 58 Cal.App.4th 1 [67 Cal.Rptr.2d 811], appellants argue that the juvenile court may consider whether adoption is in the child's best interests even when none of the enumerated exceptions to adoption apply. However, those cases analyzed language in section 366.26, subdivision (c)(4) before the Legislature added the word "best" in 1998. After the modification, section 366.26, subdivision (c)(4)(A) provided: "if the court finds that adoption of the child or termination of parental rights is not in the best interest of the child, because one of the conditions in subparagraph (A), (B), (C), or (D) . . . applies, the court shall either order that the present caretakers or other appropriate persons shall become the legal guardians of the child or order that the child remain in long-term foster care." (Stats 1998, ch. 1056, § 17.1.) That language demonstrates that best interests are considered only within the context of the exceptions provided by the Legislature in section 366.26, subdivision (c). Because *In re Jose V.* and *In re Jessie G.* analyzed an earlier version of the statute, we do not follow them.

provided five exceptions to terminating parental rights, and a general exception for the best interests of the child is not among them. Whether such an exception should exist is a question for the Legislature, not this court. (*In re Jose H.*, *supra*, 77 Cal.App.4th at pp. 1099–1100.) The juvenile court was not required to consider best interests separately from analyzing whether any of the section 366.26, subdivision (c)(1) exceptions exist.

IV

## THE JUVENILE COURT DID NOT ERR IN DENYING CARL'S SECTION 388 PETITION SINCE HE DID NOT DEMONSTRATE CHANGED CIRCUMSTANCES

Appellants assert the juvenile court erred in summarily denying Carl's section 388 modification petition brought at the close of the section 366.26 hearing.

Under section 388, a party may petition the court to change, modify, or set aside a previous court order. The petitioning party has the burden of showing, by a preponderance of the evidence, that (1) there is a change of circumstances or new evidence; and (2) the proposed change in the court's previous order is in the child's best interests. (§ 388; *In re Jasmon O.* (1994) 8 Cal.4th 398, 415 [33 Cal.Rptr.2d 85, 878 P.2d 1297].) The petition must be liberally construed in favor of granting a hearing to consider the parent's request. (Cal. Rules of Court, rule 1432(a); *In re Marilyn H.* (1993) 5 Cal.4th 295, 309 [19 Cal.Rptr.2d 544, 851 P.2d 826].) If the liberally construed allegations of the petition do not show changed circumstances or new evidence that the child's best interests will be promoted by the proposed change of order, the court need not hold a hearing. (*In re Anthony W.* (2001) 87 Cal.App.4th 246, 250 [104 Cal.Rptr.2d 422].)

Here, Carl's section 388 modification petition sought to modify the judgment terminating parental rights. However, a party may not challenge that order by means of a section 388 modification petition because once parental rights have been terminated, "the court shall have no power to set aside, change, or modify" the judgment terminating parental rights. (§ 366.26, subd. (i).) Thus, Carl could not bring a section 388 petition seeking modification of the judgment terminating parental rights.

■ However, in at least one case, the court has allowed a section 388 modification petition to be used to challenge a child's prospective adoptive placement.[14] (*In re Harry N., supra*, 93 Cal.App.4th at p. 1387.) In that circumstance, the juvenile court must determine whether the Agency abused its discretion in making its placement decision. (*Id.* at p. 1397.) On appeal, we examine whether the court correctly determined that Carl did not state a sufficient prima facie showing of changed circumstances to warrant a hearing on the issue of his placement.

Whether Carl should be placed with the M. family or the G. family has been at issue since January 2004 when Carl brought a section 388 modification petition seeking to prevent his removal from San Diego County. At that time, the court heard testimony about Carl's best interests with respect to placement with each family. The court denied the petition based in part on the opinion of the social worker that placement with the M. family was in Carl's best interests. The social worker testified the Agency would not place Carl with the G. family because they had not yet been approved to adopt and the Agency does not consider any family to be a placement option until its application has been approved.

■ To establish changed circumstances sufficient to warrant a hearing, Carl's section 388 modification petition had to allege that the G. family's application to adopt had been approved. Until that occurred, the Agency could not place Carl with that family. Carl alleged that the G. family was close to getting their foster care license, but he admitted that their adoption application had not yet been considered by the Agency.[15] Thus, the G. family was still not in a position where the Agency would consider them as a placement option. Because Carl could not be placed with the G. family, he did not make a prima facie showing that the Agency abused its discretion in refusing to place him there. At best, his petition showed the circumstances were changing, which is insufficient to warrant a hearing on a section 388 modification petition. (*In re Casey D.* (1999) 70 Cal.App.4th 38, 49 [82 Cal.Rptr.2d 426].) The court did not abuse its discretion in summarily denying the petition.

[14] We question whether a section 388 modification petition is the correct procedural vehicle to challenge the Agency's placement decision because Carl is not seeking to modify a court order. However, at least one court has allowed a section 388 modification petition to be used in such a fashion (*In re Harry N.* (2001) 93 Cal.App.4th 1378, 1387 [114 Cal.Rptr.2d 46]), and the Legislature has provided no other procedural vehicle. Further, a child should have the right to challenge that placement. Regardless, because no party has challenged whether a section 388 modification petition is the correct procedural vehicle, we need not decide that issue here.

[15] Although Carl's written petition stated that the family had been approved to adopt, counsel indicated at the hearing that the family was close to getting their foster care license and the assessment of their adoption application had not begun.

## DISPOSITION

The judgment is affirmed.

Benke, Acting P. J., and Nares, J., concurred.

A petition for a rehearing was denied May 25, 2005, and the opinion was modified to read as printed above. The petitions of all appellants for review by the Supreme Court were denied July 20, 2005. George, C. J., and Baxter, J., did not participate therein.